

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

## No. 02-21-00007-CV

———————————————————

IN THE INTEREST OF M.S., A CHILD

---

On Appeal from the 233rd District Court
Tarrant County, Texas
Trial Court No. 233-585880-15

---

Before Sudderth, C.J., Womack and Walker, JJ.
Memorandum Opinion on Rehearing by Justice Womack

## I. INTRODUCTION

After considering Mother's motion for rehearing, we deny the motion, withdraw our May 6, 2021 opinion, and substitute the following opinion in its place.

The Department of Family and Protective Services brought suit against Mother to terminate her parental rights to her daughter Mary.[1] Finding that Mother had constructively abandoned Mary and that termination was in Mary's best interest, the trial court terminated Mother's parental rights. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N), (b)(2).

Mother appealed, and in three issues, she asserts:

(1) the trial court erred by terminating Mother's parental rights because the evidence was legally and factually insufficient to support a finding that she had constructively abandoned Mary; *see id.* § 161.001(b)(1)(N);

(2) the evidence was legally and factually insufficient to support the trial court's finding that termination of the parent-child relationship between Mother and Mary was in Mary's best interest; *see id.* § 161.001(b)(2); and

(3) the trial court erred in finding that appointing Mother as permanent managing conservator of Mary was not in Mary's best interest because the appointment would significantly impair Mary's physical health or emotional development. *See id.* § 153.131.

We hold that the evidence is both legally and factually sufficient and overrule Mother's first two issues. Because the trial court did not abuse its discretion by

---

[1]We use an alias to identify the child, and we identify family members by their relation to the child. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

appointing the Department as Mary's managing conservator, we overrule Mother's third issue. We affirm the trial court's judgment.

## II. BACKGROUND

### A. Procedural

#### 1. Mother becomes pregnant with Mary, and the Department investigates.

In October 2014, then fifteen-year-old Mother was reported as a runaway. When found in December 2014, Mother asserted that she had been kidnapped, drugged, and raped. Mother tested positive for marijuana and was pregnant with Mary. In 2015, Mother (by then sixteen years old) gave birth to Mary prematurely, and Mary's meconium tested positive for opiates. The Department opened an investigation but ruled out any neglect or abuse due to Mother's circumstances.

#### 2. Mother absconds with Mary, and the Department files its first termination petition.

In October 2015, after a Department worker lost contact with Mother, the worker went to Grandmother's home (where Mother was living) and learned that Mother had been missing for five days. Law enforcement found both Mother and Mary residing with a woman who had both a history with Child Protective Services and a current CPS case. Mother admitted to law enforcement that she had not fed Mary for two days because Mother had no formula. The Department filed its first petition to terminate Mother's parental rights to Mary in October 2015, and the trial

court appointed the Department as Mary's temporary managing conservator that same month.

At some point, Grandmother's parental rights to Mother were terminated. Thus, in addition to Mary, Mother herself became a minor under the Department's conservatorship.

### a. The Department prepares a service plan for Mother.

Because Mother complains in her motion for rehearing that the "panel failed to address whether [she] was given a reasonable opportunity to comply with the service plans," we will provide details not only of the multiple service plans but also of Mother's reasonable opportunities to comply with them. To address Mother's needs, the record shows that the Department prepared a "Family Service Plan"[2] for her. The first service plan in the record is the December 2015 "Family Service Plan." *See* Tex. Fam. Code Ann. § 263.101 (requiring Department to file service plan not later than forty-five days after the temporary order appointing it as the child's temporary managing conservator). The caseworker signed it, but Mother did not. The trial court made this "Family Service Plan" the order of the court on January 6, 2016. The record also contains a February 2016 "Family Service Plan" signed by Mother but not signed by the caseworker. Except for the date printed, the December 2015 and the

---

[2]"Family Service Plans" focus on the parents, while "Child Service Plans" focus on the child.

February 2016 service plans are identical. Between the two, the service plan is signed by both a Department representative and Mother. *See id.* § 263.103(d).

Thereafter, in April 2016, in its permanency-hearing order, the trial court ordered the service plan filed on March 11, 2016, to become the order of the court. While the record does not contain a "Family Service Plan" filed on that date, there is a March 11, 2016 "Family Service Plan Evaluation" within which Mother's services were set out in the same manner as in the "Family Service Plan." The services set out in the "Family Service Plan Evaluation" remained the same as those in the "Family Service Plan."

In August 2016, in another permanency-hearing order, the trial court ordered the service plan filed on July 1, 2016, to become the order of the court. Here, the court was referring to the July 1, 2016 "Family Service Plan Evaluation." The service plan itself again remained unchanged.

Next, in the December 2016 permanency-hearing order, the trial court ordered the service plan filed on November 15, 2016, to become the order of the court. In this instance, the court was referring to the November 15, 2016 "Family Service Plan Evaluation." As before, the service plan itself remained the same.[3]

---

[3]The next eight permanency-hearing orders (those for May 17, 2017; November 15, 2017; April 25, 2018; October 10, 2018; April 24, 2019; October 9, 2019; May 6, 2020; and October 7, 2020) do not order any subsequent service plan to become the order of the court. They all provide, "It is ordered that all previous orders issued by this Court shall continue without modification."

### b. The first termination proceeding ends with the Department and Mother being appointed Mary's joint managing conservators.

Meanwhile, in September 2016, the trial court extended the dismissal date of the Department's first termination case. *See id.* § 263.401. And in February 2017, the trial court signed a final order in which the Department and seventeen-year-old Mother were made Mary's joint managing conservators.

### c. The Department prepares service plans for Mother while she is a joint managing conservator.

When a parent is a joint managing conservator, the Department's standard procedure is to have the parent work a service plan. The purpose of continuing services is to address the concerns that brought the child into care and to help parents make the changes needed to return the child to the parents.

The first appearance of a service plan after the February 2017 final order appears in the April 12, 2017 "Family Service Plan Evaluation," which lists the same "tasks and services" as were listed in the original "Family Service Plan," but two of the "tasks and services" are identified as "No Longer Needed." The April 12, 2017 "Family Service Plan Evaluation" lists two new "tasks and services" that did not appear in the original "Family Service Plan":

> [Mother] will work on completing her GED so that she can begin the cosmetology program while living in extended foster care with her daughter, [Mary]. Completing these goals will help [Mother] to become financially stable and able to provide for the needs and care of [Mary].

> [Mother] has signed an agreement to remain in extended foster care since she has been reunited with her daughter in a foster home for

unwed mothers. [Mother] will continue to allow her foster mom to mentor her in caring for [Mary] so that she can learn how to care for her independently eventually.

It is not clear if the "Family Service Plan Evaluation" itself was attempting to modify Mother's service plan or whether it was simply reflecting a modification that appeared in a "Family Service Plan" that is not in the record. Unlike the trial court's previous permanency-hearing orders, in its May 17, 2017 order, the trial court did not make the April 12, 2017 "Family Service Plan Evaluation" the order of the court but ordered, instead, "that all previous orders issued by this Court shall continue without modification."

A later "Family Service Plan" appears in what looks like an attachment to the Department's September 17, 2018 "Placement Review Report to the Court." The report mentions that Mother has a family service plan. Behind the report are numerous documents, none of which is independently file-marked but which were, in all likelihood, attachments to the report. One of the attachments is a "Family Service Plan" with the notation that it was printed on September 13, 2018. This service plan varies from the previous service plans. It required Mother

- to participate in a support group for young women who have been sex trafficked;

- to provide the names and phone numbers of any family members who may be appropriate placements for Mary;

- to submit to random drug testing;

- to demonstrate the ability to meet the financial needs of Mary and to show her ability to maintain financial stability;

- to participate in a psychological assessment/evaluation;

- to submit to a drug assessment;

- to maintain safe, stable, and appropriate housing, and in the event that Mother changed her address, to notify her caseworker within seventy-two hours;

- to refrain from involvement in criminal activities and illegal acts;

- to complete a psychiatric consultation to accurately diagnose any mental health illnesses that may be present; and

- to maintain consistent contact, at least weekly, with the caseworker in person, by phone, or by email.

The caseworker identified in this service plan as Mother's contact was Cassandra Fox. Mother testified that Fox had gone over the service plan with her: "Ms. Cassandra went over my service plan with me, but some of my caseworkers did not go over my service plan with me. Like I told you, some things were added." Although unclear, Mother's comment suggests that she was aware of the September 2018 "Family Service Plan."

This September 2018 "Family Service Plan" is not signed by the caseworker or by Mother. *See id.* § 263.104(b)(1). It nevertheless arguably became effective because the Department filed it with the court. *See id.* § 263.104(b)(2) ("The amended service plan supersedes the previously filed service plan and takes effect when . . . the

8

department determines that the child's parents are unable or unwilling to sign the amended plan and files it without the parents' signatures.").

The trial court's next permanency-review order, signed on October 10, 2018, recites, "It is ordered that all previous orders issued by this Court shall continue without modification." It did not contain the language seen in previous permanency-review orders adopting a service plan filed on a particular date as the order of the court.

### 3. The joint managing conservatorship continues for over two years.

After the February 2017 final order, the trial court conducted permanency hearings about every six months—May 2017, November 2017, April 2018, October 2018, and April 2019. The April 2019 permanency order stated that Mary's permanency goal was family reunification, permanent managing conservatorship to fictive kin, or adoption.

### 4. Citing Mother's lack of progress, the Department files its second "original" termination petition.

Before the next permanency hearing, in July 2019, the Department filed another "original" petition for termination.[4] By this time, Mother was twenty years

---

[4]Technically, the Department filed a motion to modify seeking termination. *See* Tex. Fam. Code Ann. § 156.001; *In re F.M.E.A.F.*, 572 S.W.3d 716, 723–24 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); *In re E.K.C.*, 486 S.W.3d 614, 615 (Tex. App.—San Antonio 2016, no pet.).

old, and Mary was four years old. The affidavit supporting the petition explained why

the Department was seeking termination:

> [Mother] was placed in foster care with the opportunity to be placed with her daughter. The Department was hopeful that [Mother] would be able to be prepared for independence by the time she aged out so that she could be a protective parent outside of CPS care[,] but [Mother] left care in May 2018. [Mother] was given a new service plan to work on. Since leaving care, [Mother] has not completed any tasks given to her on her service plan. [Mother] has not given proof of residence or proof of employment. [Mother] has not consistently visited with [Mary]. [Mother] has not addressed concerns about her ability to parent [Mary].

### a. The Department prepares another service plan for Mother.

A conservatorship caseworker assigned to Mary's case from July 2019 through

February 2020 testified that she had prepared a service plan that she sent to Mother in

January 2020. The record, however, contains no corresponding "Family Service

Plan."

### b. The second termination case proceeds to trial.

More than a year after the Department had filed this second termination

proceeding, in December 2020, the case proceeded to trial.[5] By December 2020, the

Department had been Mary's temporary or joint managing conservator and Mary had

been in the Department's care for over five years.

---

[5] When filing the motion to modify seeking termination, the Department was already a joint managing conservator. Thus, the dismissal deadline associated with Section 263.401 of the Texas Family Code did not apply because the triggering mechanism—an order appointing the Department as temporary managing conservator—never occurred. *See* Tex. Fam. Code Ann. § 263.401(a).

**B. Trial**

**1. Mother testifies.**

Mother testified that she and Mary were initially removed from Grandmother's home. At first, Mother and Mary were in different placements, but the Department told Mother that it wanted to place them together.

The Department succeeded. Mother and Mary were placed in a group home with other teenage mothers who were the victims of sex trafficking. Mother stated that she loved that placement, but the home's license expired, so the Department had to find a new placement.

From there, Mother and Mary moved into a foster home. By this time, Mother was eighteen years old. According to Mother, this placement did not go so well; Mother explained that she "met the wrong guy," "snuck out of the house," and "did a couple of things that [she] shouldn't have." Mother said that she wanted to live independently with Mary and that the Department said that it would help her, but when the independent living did not happen, Mother left the foster home. Mary, however, remained in the foster home.

After leaving the foster home, Mother stayed with Great-grandmother, but staying with Great-grandmother did not work out either. Mother explained that she had to sleep on the floor and that she, Great-grandmother, and her "papaw" had conflicts, so Mother decided to try living on her own.

11

Meanwhile, Mary was moved to a foster home in Tyler. Because Tyler was so far away, visiting Mary became complicated. Mother would have to travel to the Department's Fort Worth office and meet with a caseworker, and that caseworker would drive Mother to Tyler.[6] At the time of trial, Mary was in a different foster placement.

Mother admitted missing at least half her visits with Mary in the last year and that visits were part of her service plan. She acknowledged not completing counseling and that counseling was part of her service plan. Mother conceded not having completed her drug classes, although she asserted that she was in the process of completing them. By Mother's account, she was in her last week of ten weeks of drug classes. Mother admitted having used marijuana three weeks before trial and having used marijuana while taking her drug classes, but she asserted that she had used marijuana just that one time. According to Mother, she had completed her parenting classes and psychological evaluation. Regarding getting her GED, Mother stated that she had taken the test four times and failed it each time, but her intention was to continue trying to get her GED.

Mother had a boyfriend. Initially, Mother said that her boyfriend was born in 1996. Later she said that her boyfriend was forty years old. Eventually she agreed that her boyfriend was born in 1969, which made him fifty-one years old. He had

---

[6]Mother clarified, "It wasn't actually a caseworker. I think [the driver] worked with [Our Community Our Kids.]"

children, but his children did not live with him. Mother said, "I'm trying to get myself together[,] and he's trying to get himself together." Mother thought that one of her earlier caseworkers (one of those who did not testify at her trial) had run a background check on her boyfriend. When asked if Mother would be surprised to learn that her boyfriend had been arrested in August 2020, she responded, "Yes." And when asked if she would be surprised to learn that her boyfriend had a reason-to-believe finding in his CPS history, she answered, "No -- Yes."

Mother stated that she had rented her own apartment in June 2020. Her boyfriend lived with her, and she and her boyfriend went half and half on the expenses. She claimed to have a full-time job working at Walmart Logistics. She explained, "Basically, I currently just got back on my feet. [Before getting my own apartment,] I was going from place to place, from sleeping . . . at my friend's house and not having a place to stay and getting up on my feet."

### 2. Susan Jensen (a caseworker and supervisor) testifies.

Susan Jensen was initially the conservatorship caseworker and was later the conservatorship supervisor for Mary's case from July 2015 until February 2020. Jensen asserted that the Department developed service plans for Mother that covered such things as parenting classes, individual counseling, family counseling, drug assessment, drug testing, drug education, a support group for sex-trafficked victims, appropriate housing, stable employment, and appropriate childcare. By Jensen's account, Mother had agreed to work services and had opportunities to have the

service plans explained to her. Despite Mother's expressed willingness to work services, Jensen said that Mother failed to make any progress: "Mom has done some individual counseling, but then she missed and did not go. She did go for a couple of drug tests, but she missed the majority of them. She did not consistently come to visits. She did not have stable housing or stable employment."

Jensen described Mother and Mary's move from the group home for sex-trafficked victims to a foster home in a manner that differed slightly from Mother's version:

> [Mother] had been at a group home for sex[-]traffick[ed] victims with [Mary] where she was learning parenting skills. She was finishing her GED. She was working to complete that. That group home was looking to get relicensed, and at that time it was decided between the case manager, [Mother], [and] the group home, that she was ready, kind of, for a step-down where she could go into a foster home, develop more normal skills, have more practice at her own parenting, still within a foster home setting, though, so she had guidance and support to meet those basic needs because she was not financially stable and did not have her own place to live and so she could continue with her schooling.

After Mother and Mary's move into the foster home, Jensen related the problems that followed:

> Approximately May 2018, [Mother] had left extended foster care and moved out of the foster home. There w[ere] concerns that she was using marijuana; leaving the home and drinking alcohol; that she would leave [Mary] unattended overnight without letting [the] foster parent know, without having a babysitter or telling foster mom, and [Mother] would be gone for [eighteen] or more hours without coming back, wouldn't let [the foster mother] know; would go out of state; wasn't making her visits; concerns that she would come back with money and wouldn't be able to explain where she got it from; that she was getting in

14

fights with her sister and with other people; [and] that she . . . test[ed] positive a couple times for marijuana use.

Mother's leaving the foster home for extended periods, Mother's leaving Mary behind when Mother left, and Mother's failure to tell anyone that she was leaving Mary unattended was a problem:

> Could be anywhere from [eighteen] hours to [thirty] hours. Leave in the middle of the night, so it was unknown that [Mary] was in the room unsupervised, by herself. That [Mary] would follow her downstairs[,] and the foster mom would find her crying because [Mother] would leave and she -- the foster mom was not aware that she was leaving at these times.

Jensen stated that Mother was not required to stay in the foster home, but if Mother left, she was not allowed to take Mary with her.

Mother admitted using marijuana and refusing multiple times to take a drug test. She was supposed to get drug tested once a month, but she did not go for over a year between June 2018 and July 2019. The Department explained to Mother that if she did not go to the drug tests, the Department would presume that she would have tested positive; despite that, Mother continued not taking drug tests.

After Mother left the foster care residence, the Department set up visits:

> Initially, they were set up weekly so [Mother] could have that weekly communication, and then after [Mother] wasn't able to make those visits weekly, it was discussed between her and the caseworker to attempt to do them every two weeks, so -- and having longer periods of time so she wouldn't necessarily miss them.

Jensen elaborated:

15

> After [Mother] left in May of 2018, she came for one visit in June, and then two visits in July and August, and then one visit in September, a visit in October, a visit in December of 2018. And then it was not until February 2019, and then April 2019, and then two visits in June of 2019. And then not again until January 2020 and February 2020.

In short, Jensen stated that Mother had missed over half of her visits.

Meanwhile, Mary was moved yet again. The Department placed Mary into a new foster home in August 2020.[7]

Jensen asserted that Mother was never able to show stability of any kind for her household. Employment and a stable income were part of Mother's service plan, but Mother never provided any documentation to show either. Jensen explained that to account for money, Mother would say that she would do hair or sell clothes and that she worked at the airport. Jensen concluded that Mother had not shown the ability to provide Mary with a safe and stable environment.

### 3. Lindsey Miller (another caseworker) testifies.

Lindsey Miller was Mary's caseworker from July 2019 until February 2020. Miller stated that she sent Mother a service plan by email in January 2020, Mother responded that she had received it, and she and Mother went over the service plan by email and phone calls. Miller said that maintaining contact with Mother was difficult

---

[7]The "Placement Review Report to the Court" for September 2020 (it was prepared in August but filed in September for the October hearing) provides simply: "[Previous caregiver] could no longer meet child's needs."

and that she and Mother met face-to-face only once in November 2019. Miller stated, "We could never get . . . an exact address . . . ." Elaborating, Miller said:

> I would hear that she was -- I mean, be living with a friend. I think she often used -- I believe it was her grandmother's address, but I don't -- I could never really confirm if she was actually living there. She would tell me that she's living in the Hulen area. She would be living with a friend, but she would be moving out soon to get her own place. I could never really pin down exactly where.

Mother's instability in housing concerned Miller. Mother also failed to show that she could maintain a steady income or employment. According to Miller, Mother had identified a boyfriend (the one with whom she was currently living) but had not provided the Department with much information about him. The only thing that Miller knew about him was that "he was trying to . . . get on his feet and be stable as well."

Miller did not think that Mary should be returned to Mother: "[Mother] did not show that she could even maintain a steady relationship with her child, let alone be able to provide for a child full-time." Miller added, "[F]rom my portion of the case, [Mother] did not make any progress towards her service goals of getting stable, making that bond with her child, and really showing the Department that she could safely care for her young child."

### 4. Foster Mother testifies.

The Department placed Mary with Foster Mother in August 2020, so Foster Mother had had Mary about four months at the time of trial, and during that time

Foster Mother said that Mary had bonded to Foster Mother, Foster Father, and the two other children in their home. Foster Mother described Mary as "a very happy child, but a little emotionally unstable." Foster Mother added, "She called everybody mom, everybody dad. She wasn't sure who her parents were."

Foster Mother said that Mother would cancel scheduled visits on the day of the visit or would just not show up. Foster Mother described the effect that Mother's missing scheduled visits had on Mary:

> [Mary is] -- before we leave, she's trying to take her stuff because she thought she wasn't coming back. That's what -- anytime I explain to her about something [the Department has] going on, she -- she's not understanding. She's thinking, ["]Well -- Okay, well, I need to take my bike, I need to take this, and so on.["] I'll try my best to explain to her and prepare her for what's going to take place. So then I -- once I started preparing her, she was good until we got there and the visit didn't happen. So then she was, you know, crying, all emotional. But then once -- I just said, ["]We're not doing this anymore.["] I called and talked to [the caseworker]. I said, ["]We're not doing this anymore. We're not -- I'm not going to prepare her. We're going to just show up at the building and then see what happens then.["] But my five[-]year old, she knows everything, she's real smart, and she was like, ["]Oh, this is the place where [Mary's] mom is.["] So she ruined everything for me. So we get there, and then [Mary is] -- ["]Oh, oh, I'm going to go see [Mother].["] She says, ["]I'm going to go see [Mother,] and she's going to buy me cupcakes.["] So [my five-year old] ruined it all. So then we get there[,] and we go upstairs[,] and we wait, and [Mother] said, ["]I'm five minutes out, I'm 10 minutes out,["] and we sat there[,] and we waited, and then we [were] like, ["]We're leaving.["] I just -- half the time, I either left the visit or I either -- told [Mother], ["]Well, hey, you can just go ahead and visit this 30 minutes. But either way, at 5:00 o'clock[,] we're leaving.["]

Foster Mother said that initially Mary had trouble sleeping but that was no longer a problem.

Both Foster Mother and Foster Father worked. But to take care of Mary, Foster Mother had taken time off from work.

### 5. Jermonica Glover (the current caseworker) testifies.

Jermonica Glover was Mary's current caseworker; Glover received the case in November 2020—about three and a half weeks before trial.[8] Glover went to Mother's two-bedroom apartment the day before trial and learned that Mother was living with someone else. Mother said that one of the bedrooms was reserved for Mary, but that bedroom was empty; it had no bed, no toys, and no clothes. Mother told Glover that she was employed and was working at a warehouse, but when Glover asked for check stubs or proof of employment, Mother could not provide any. Mother explained that she was still waiting for the company to provide proof on its website. Other than not having much furniture, Glover agreed that the apartment itself provided a clean and safe environment; despite that, Glover denied that Mother had shown the ability to provide Mary with a safe and stable environment.

Glover did not recommend returning Mary to Mother:

> Just because of the consistency and -- just -- [Mary's] been in the system
> for five years, for her whole life, and right now it's time for her to get
> stability and -- stability with a home and a forever home, and different

---

[8] Three other caseworkers (Cassandra Fox, Alejandra Berdoza, and Jamila Pankey-Lawson) were assigned to Mother's case at various times but did not testify. The Department called Mother's caseworker from the first termination proceeding (Tammie Goss), but the trial court sustained Mother's objection to that caseworker because her participation in the case predated the February 2017 final order, so she was not allowed to testify.

19

people are coming in and out of her life, and it's just time for her to just have stability and a forever home.

Glover testified that Mary was bonded with both foster parents and the other children in the home. Mary lived in a "nice home" in a "nice neighborhood," shared a bedroom with a sister, and had her own toys. The foster family provided a safe, stable, and loving home and was able to meet Mary's physical, emotional, and financial needs both now and in the future. The Department's plan for Mary was adoption, and the foster family was adoption motivated. Glover asked the court to terminate Mother's parental rights because termination was in Mary's best interest. Glover explained, "[Mary's] still little[,] and she's been in the system for her entire life[,] and it's time for her to have stability and get out of the system. I mean, it's just time for her to have a forever home and live a normal -- normal life."

## III. DISCUSSION

### A. Standard of Review Generally

In a termination case, the State seeks not just to limit parental rights but to erase them permanently and—except for the child's right to inherit—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Thus, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures."

*In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).

Clear and convincing evidence must support the decision to terminate. *See* Tex. Fam. Code Ann. §§ 161.001(b), .206(a); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right,'" due process demands this heightened standard. *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397). To be clear and convincing, evidence must "produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent–child relationship, the party seeking termination must establish, by clear and convincing evidence, that (1) the parent's actions satisfy just one of the many predicate grounds listed in Family Code Section 161.001(b)(1), and (2) termination is in the child's best interest under Section 161.001(b)(2). Tex. Fam. Code Ann. § 161.001(b)(1), (2); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

## B. Sufficiency Standards of Review

Mother's first two issues challenge the legal and factual sufficiency of the evidence supporting the trial court's findings. Before addressing her issues on their merits, we set out the standards of review.

21

### 1. Legal Sufficiency

When evaluating the evidence for legal sufficiency in termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved both the particular ground for termination and that termination is in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam). We review all the evidence in the light most favorable to the findings and judgment, and we resolve any disputed facts in favor of the findings if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. We consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* In doing our job, we must recognize that weighing a witness's credibility is the factfinder's province, not ours. *J.P.B.*, 180 S.W.3d at 573. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations provided they are not unreasonable. *Id.*

### 2 Factual Sufficiency

We must perform "an exacting review of the entire record" when determining whether the evidence is factually sufficient to support terminating a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In a factual-sufficiency review, we give due deference to the factfinder's findings and do not supplant those findings with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). We determine whether, on the entire record, a factfinder could reasonably form a firm

conviction or belief that the parent violated an alleged ground and that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). If, in light of the entire record, the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## C. Scope of Evidentiary Review

In Mother's reply brief, relying on Section 161.004 of the Texas Family Code, she argues for the first time that our sufficiency review is restricted to evidence that occurred after the February 2017 final order. *See* Tex. Fam. Code Ann. § 161.004 ("Termination of Parental Rights After Denial of Prior Petition to Terminate").[9] She

---

[9]Section 161.004 provides:

(a) The court may terminate the parent-child relationship after rendition of an order that previously denied termination of the parent-child relationship if:

(1) the petition under this section is filed after the date the order denying termination was rendered;

(2) the circumstances of the child, parent, sole managing conservator, possessory conservator, or other party affected by the order denying termination have materially and substantially changed since the date that the order was rendered;

(3) the parent committed an act listed under Section 161.001 before the date the order denying termination was rendered; and

(4) termination is in the best interest of the child.

complains that the Department, in its response brief, transgressed Section 161.004 by relying on events that occurred before February 2017.[10]

As our trial summary shows, the Department sought termination based on Mother's conduct after the February 2017 final order. At trial, on the basis of res judicata (and not on the basis of Section 161.004), Mother actively sought to preclude

---

(b) At a hearing under this section, the court may consider evidence presented at a previous hearing in a suit for termination of the parent-child relationship of the parent with respect to the same child.

Tex. Fam. Code Ann. § 161.004; *see In re S.B.*, No. 02-18-00310-CV, 2019 WL 1388760, at *4 (Tex. App.—Fort Worth Apr. 25, 2019, pet. denied) (per curiam) (mem. op.).

[10]Section 161.004 makes its first appearance in Mother's case in her reply brief. At the trial-court level, Section 161.004 played no role at all. In the Department's petition, in Mother's answer, and in the termination judgment, Section 161.004 is never cited. At trial, Section 161.004 was never mentioned. Even the trial court's findings of fact and conclusions of law are silent regarding Section 161.004. At the appellate level, neither Mother in her original brief nor the Department in its response brief cited Section 161.004. Arguably any reliance on Section 161.004 was waived or not preserved. *See In re T.B.*, 594 S.W.3d 773, 778 (Tex. App.—Waco 2019, no pet.) (holding that complaint was not preserved because it was not raised at trial); *In re A.R.*, No. 02-18-00311-CV, 2019 WL 1186963, at *9 (Tex. App.—Fort Worth Mar. 14, 2019, pet. denied) (mem. op.) ("We normally do not review issues raised for the first time in a reply brief."); *M.M.V. v. Tex. Dep't of Family & Protective Servs.*, 455 S.W.3d 186, 190 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("The rules governing error preservation apply to civil cases involving termination."); *Pineridge Assocs., L.P. v. Ridgepine, LLC*, 337 S.W.3d 461, 472 n.10 (Tex. App.—Fort Worth 2011, no pet.) (stating that arguments raised for the first time in a reply brief are waived). The gist of Mother's complaint, though, is the scope of what we consider when determining her sufficiency complaints (independent of any reliance on Section 161.004), which Mother asserts the Department has improperly expanded. Resolving Mother's sufficiency complaints necessarily requires resolving that issue, so we will address it.

24

evidence that predated the February 2017 final order. She objected to one of the Department's witnesses because virtually all that witness's knowledge predated the February 2017 final order, and the trial court refused to hear that witness's testimony. Later, Mother objected to another witness's testimony to the extent that this witness addressed events predating February 2017, and the trial court sustained Mother's objection. In a third instance, the trial court overruled Mother's objection because that particular piece of evidence had already been admitted without objection. Consequently, to the extent that the Department attempted to address matters before the final order, Mother objected.

In her reply brief, Mother's primary complaint is with the Department's discussion of the procedural history, which it placed under the rubric "Statement of Facts." The Department also relied on the clerk's record to flesh out its family service plan discussion.

We too have looked at the procedural history. The procedural history is precisely what gave rise to Mother's res judicata objection at trial and her Section 161.004 argument here on appeal. Unlike the Department, we have separated our review of the procedural history from our review of the evidence presented at trial.

We agree with Mother to the extent that our sufficiency review is limited to the evidence presented at trial. *See In re J.D.*, 436 S.W.3d 105, 121 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Despite the confusion, the Department appears to agree with this proposition as well. Under the heading "Argument," the Department's

25

response to Mother's first issue is: "The evidence presented at trial was legally and factually sufficient to support the trial court's finding that [Mother] constructively abandoned [Mary]." And in response to Mother's second issue, the Department asserted: "The evidence presented at trial was legally and factually sufficient to support the trial court's finding that termination is in [Mary's] best interest." As discussed below, the evidence presented at trial focused on events following the February 2017 final order.

## D. Constructive Abandonment

In Mother's first issue, she challenges the legal and factual sufficiency of the evidence supporting the trial court's constructive-abandonment finding. For the reasons set out below, we overrule Mother's first issue.

### 1. The Law

The Department proves that a parent has constructively abandoned a child by showing that

> the child . . . has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and:
>
> (i) the department has made reasonable efforts to return the child to the parent;
>
> (ii) the parent has not regularly visited or maintained significant contact with the child; and
>
> (iii) the parent has demonstrated an inability to provide the child with a safe environment[.]

26

Tex. Fam. Code Ann. § 161.001(b)(1)(N); *accord In re F.E.N.*, 542 S.W.3d 752, 766 (Tex. App.—Houston [14th Dist.] 2018), *pet. denied*, 579 S.W.3d 74 (Tex. 2019) (per curiam). "The first element focuses on the Department's conduct; the second and third elements focus on the parent's conduct." *In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *accord In re C.E.P., III*, No. 01-19-00120-CV, 2019 WL 3559004, at *17 (Tex. App.—Houston [1st Dist.] Aug. 6, 2019, no pet.) (mem. op.).

## 2. Discussion

### a. Reasonable Efforts

When reviewing whether sufficient evidence supports termination under Section 161.001(b)(1)(N), the issue is whether the Department made reasonable efforts, not ideal efforts. *See In re M.V.G.*, 440 S.W.3d 54, 61 (Tex. App.—Waco 2010, no pet.); *In re G.K.G.A.*, No. 01-16-00996-CV, 2017 WL 2376534, at *5 (Tex. App.—Houston [1st Dist.] June 1, 2017, pet. denied) (mem. op.). When the Department removes a child, it designs a family service plan to reunify the parent with the child. *Liu v. Dep't of Family & Protective Servs.*, 273 S.W.3d 785, 795 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Preparing and administering a service plan for the parent constitutes evidence that the Department made reasonable efforts to return the child to the parent. *See, e.g., In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.).

27

The testimony showed that the Department prepared family service plans for Mother (even if the service plans were not introduced into evidence), and for about five years, the Department made reasonable efforts to help Mother stabilize her life with the goal of safely reunifying Mary with Mother. For example, the Department placed Mother and Mary in a group home with other teenage mothers who were the victims of sex trafficking. From there, the Department placed Mother and Mary into a foster home so that Mother could develop more day-to-day skills and have more practice at parenting on her own while she was still within a foster home setting, where she could have guidance and support, and where she could continue with her schooling. The Department developed service plans that covered such things as parenting classes, individual counseling, family counseling, drug assessment, drug testing, drug education, stable employment, and appropriate childcare. When Mother left foster care, the Department set up weekly visits between Mother and Mary, but when weekly visits proved unworkable, the Department set up bi-weekly visits. When Mother did not have the means to travel to Tyler to visit Mary, the Department arranged for someone to drive Mother to Tyler (provided Mother could find a way to the Department's Fort Worth office). Mother admitted taking the GED test four times. Finally, the Department provided Mary with stable and safe homes while it gave Mother an opportunity to work services and to get her life in order.

Mother complains that "she was not given a reasonable opportunity to comply with the service plans due to, among other things, the numerous times that the

28

Department changed the service plan without informing [her] or filing the plans with the court and the visitation schedule implemented by the Department." We disagree. Based on the testimony, the trial court could have concluded that Mother had been given a reasonable opportunity to comply with her service plan.

To the extent there was a communication breakdown, Mother played a role in it. Mother herself admitted that she was itinerant: "Basically, I currently just got back on my feet. Like I said, I just moved [into my apartment] in June. Before then, I was going from place to place, from sleeping -- you know, sleeping at my friend's house and not having a place to stay and getting up on my feet." As might be anticipated, this created problems for the Department. Jensen testified that when Mother left foster care in May 2018, she did not give the Department an address, so the Department did not know where she was. Miller too related how Mother would give the Department conflicting or generally unhelpful information about where she was staying. Miller asserted that she never succeeded in determining Mother's exact location. Consequently, on this record, the trial court could have concluded that if Mother did not have copies of her service plan, it was not because the Department was not making the effort but because Mother was difficult to locate.

Mother complains that the Department left her uninformed about changes. The testimony, though, shows that even if the Department had difficulty locating Mother, the Department maintained some communications with her. Jensen testified that after July 2019, she personally gave Mother a copy of her service plan and

29

asserted that Mother had opportunities to have the service plan explained to her and noted, as an example, when Mother came for visits. Jensen added that if Mother was "unavailable," a caseworker would attempt to mail the service plans to Mother. Jensen was not alone. Miller testified that she went over the service plan with Mother by emails and phone calls in January 2020. And Glover, who became Mother's caseworker in November 2020, testified that she communicated with Mother by phone. Although Glover acknowledged not going over the service plan with Mother, Mother had opportunities to communicate any concerns that she had with Glover.

As for the changes in Mother's service plan, Jensen, who had worked on the case from July 2015 until February 2020, described Mother's services after July 2019 as follows, "Parenting, individual counseling, and she had some family counseling on there, drug education, drug assessment, support group for sex trafficking victims, FOCUS, appropriate housing, stable employment, . . . appropriate child care[, and drug testing]." When asked about the nature of any changes, Jensen responded, "I know the services pretty much were the same. I know we tried to change them based on her locations of where she was living because she said she didn't want to start services in one place and then have to move again." Thus, the evidence shows that the Department made the changes in the service plans to accommodate Mother. The changes in the visitation plan were also made to accommodate her.

Another opportunity for changing the service plan occurred in January 2020. Miller testified that she created a service plan and sent it to Mother by email in

January 2020 and that she went over it with Mother and explained it to her. Miller described the service plan that she had created:

> She had been asked to -- to have a steady income, employment, to make sure that she could provide for her child. We asked that she consistently visit with her child. We asked that she participate in family therapy when the therapist of the child felt that that would have been appropriate. We asked that she complete FOCUS Motherhood, which is kind of a parenting -- like, CPS navigation-type course. We asked that she develop a strong support system to kind of help her with -- I mean, kind of just getting a stable living environment. We asked her to be randomly drug tested. We asked that she complete a drug and alcohol assessment. We asked that she complete a psychological evaluation. And we asked that she complete counseling.

Based on the testimony, the trial court could have reasonably concluded that whatever changes occurred, they were not radical and that, as noted earlier, Mother had opportunities to discuss the plans with her caseworkers. Therefore, the trial court could have reasonably concluded that the Department was not changing Mother's service plan without telling her and then faulting her for noncompliance.

Regarding the filing of the service plans, with some exceptions not applicable here, the first service plan must be filed. *See* Tex. Fam. Code Ann. § 263.101. The same is true for visitation plans. *See id.* § 263.107(d) (specifying deadline for filing visitation plan). Amended or modified service and visitation plans must also be filed. *Id.* §§ 263.105(a), 263.107(e). The testimony is not clear about which service plans were and were not filed. Regardless, if the parent has any complaint about an amended service plan, the parent is not without recourse: "A parent may file a motion with the court at any time to request a review and modification of the amended

31

service plan." *Id.* § 263.104(c). This is also true for visitation plans. *See id.* § 263.108(c) ("A parent who is entitled to visitation under a visitation plan may at any time file a motion with the court to request review and modification of an original or amended visitation plan.").

When determining whether the Department made reasonable efforts, we focus on its efforts, not the parent's. *See In re D.G.*, No. 02-17-00332-CV, 2018 WL 547787, at *4 (Tex. App.—Fort Worth Jan. 25, 2018, no pet.) (mem. op.). The Department's efforts must be reasonable, not ideal. *See M.V.G.*, 440 S.W.3d at 61. When encountering an amended service plan that did not appear in the record, one of our sister courts looked at what the parent knew and what information the Department provided:

> Although the Department did not include the amended service plan in the record before this court, the record reflects that the Department implemented an amended plan and mailed it to Father. According to the caseworker's report and the trial court's orders, the record reflects that Father knew what was required by the service plan and was informed of the consequences of a failure to follow the plan.

*In re A.M.T.*, No. 14-18-01084-CV, 2019 WL 2097541, at *5 (Tex. App.—Houston [14th Dist.] May 14, 2019, pet. denied) (mem. op.). Despite the amended service plan's absence from the record, our sister court concluded that the Department had provided legally and factually sufficient evidence to support the finding that it had made reasonable efforts to return the child to the parent:

> By implementing a family service plan and notifying Father of the plan and the consequences of failure to comply with the plan, the

Department met its burden on the first element. We conclude a reasonable trier of fact could have formed a firm belief or conviction that the Department made reasonable efforts to return the child to Father.

*Id.*

The testimony shows that Mother was aware that service plans existed that she did not have copies of and that her services were changing: "Two of my service plans, I did not get, and one of my service plans, things were added without me even knowing." But the first time that Mother voiced any complaints about any aspect of her service plans—including whether she had received copies of them—appears to have been at her termination trial.

Before trial, Mother had numerous opportunities to obtain a copy of her service plan. Every time Mother visited Mary, she had to first travel to the Department's Fort Worth office. Therefore, every trip was an opportunity to request a copy of her service plan. Her testimony does not point to any efforts that she had previously taken to alert the Department or the trial court to this complaint.[11] *See K.C. v. Tex. Dep't of Family & Protective Servs.*, No. 03-17-00184-CV, 2017 WL 3585255, at *3 (Tex. App.—Austin Aug. 17, 2017, no pet.) (mem. op.) ("The record further shows

[11]The permanency-hearing orders for May 17, 2017, and November 15, 2017, show that Mother was not notified and did not appear. But the permanency-hearing order for April 25, 2018, shows that both Mother and her counsel appeared. The remaining permanency-hearing orders—those for October 10, 2018; April 24, 2019; October 9, 2019; May 6, 2020; and October 7, 2020—show that only Mother's counsel appeared. Mother thus had numerous opportunities to address any concerns regarding her service plan.

33

that [the father] did not seek modification of or relief from the court-ordered service plan on the basis of impossibility at any time prior to the termination hearing when modifications or relief, if necessary, could have been ordered.").

Significantly, this is not a case in which the Department sought to terminate Mother's rights based on her failure to comply with an order adopting the service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O) ("[T]he parent has . . . failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child . . . ."); *In re J.M.T.*, 519 S.W.3d 258, 261 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ("Following the hearing, the trial court signed a status hearing order, approving and incorporating by reference the Department's family service plan, making the service plan an order of the court."); *see also* Tex. Fam. Code Ann. § 263.106 ("After reviewing the original or any amended service plan and making any changes or modifications it deems necessary, the court shall incorporate the original and any amended service plan into the orders of the court . . . ."); *cf. id.* § 263.109(a) ("After reviewing an original or amended visitation plan, the court shall render an order regarding a parent's visitation with a child that the court determines appropriate.").

When services are court ordered, the parent bears the burden of complying with them. *See K.C.*, 2017 WL 3585255, at *2; *In re B.L.D.-O.*, No. 13-16-00641-CV, 2017 WL 929486, at *4 (Tex. App.—Corpus Christi Mar. 9, 2017, no pet.) (mem. op.); *In re P.N.M.*, No. 11-08-00080-CV, 2009 WL 714190, at *3 (Tex. App.—Eastland

34

Mar. 19, 2009, no pet.) (mem. op.); *Thompson v. Tex. Dep't of Family & Protective Servs.*, 176 S.W.3d 121, 127 (Tex. App.—Houston [1st Dist.] 2004, pet. denied), *overruled on other grounds by Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 250–52 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc) (holding that courts review evidentiary sufficiency issue under the statutory grounds specifically found in the trial court's termination order rather than any statutory grounds supported by the evidence even if not found in the order). If a parent is confused about a service plan or thinks that it is unfair, the parent may file a motion at any time to request the court to review the plan. *See* Tex. Fam. Code Ann. §§ 263.104(c), 263.105(c).

Whether the Department could prove noncompliance with an order without producing the order allegedly violated is not before us. *See In re M.G.*, No. 07-19-00289-CV, 2020 WL 611554, at *5 (Tex. App.—Amarillo Feb. 7, 2020, no pet.) (mem. op.) ("[T]o support a termination order based on section 161.001(b)(1)(O), there must be a court order rather than simply a Department-generated service plan."). Rather, the question before us is whether the Department made reasonable efforts to return the child to the parent. Preparing and administering a service plan for the parent constitutes evidence that the Department had made reasonable efforts. *See K.M.B.*, 91 S.W.3d at 25. While implementation of a service plan is not the exclusive means of showing that the Department made a reasonable effort to return the child to a parent, implementation of a service plan is often the means by which the Department seeks

35

to meet its burden. *In re J.W.*, 615 S.W.3d 453, 463 (Tex. App.—Texarkana 2020, no pet.). The Department's failure to file its service plans might have prejudiced its ability to seek termination under Section 161.001(b)(1)(O), but efforts to return a child to a parent with unfiled service plans do not translate into no efforts whatsoever under Section 161.001(b)(1)(N). If Mother had shown progress under the unfiled service plans and had shown that she could safely parent Mary, the unfiled service plans would have served their purpose of facilitating Mary's return to her.

Mother does not dispute that she had service plans; just the opposite, Mother asserted that she had tried—at least recently—to work her service plans. Thus, the trial court could have found that the Department had made reasonable efforts to return Mary to Mother and that Mother had been given reasonable opportunities to comply with the service plan. *See In re J.S.*, No. 02-19-00231-CV, 2019 WL 5655254, at *5 (Tex. App.—Fort Worth Oct. 31, 2019, pet. denied) (mem. op.); *In re G.T.*, No. 02-17-00279-CV, 2017 WL 6759036, at *4 (Tex. App.—Fort Worth Dec. 28, 2017, no pet.) (mem. op.); *In re M.R.J.M.*, 280 S.W.3d 494, 505–06 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g).

### b. Regular Visits and Significant Contact

The Department placed Mother and Mary together. In May 2018, Mother left both foster care and Mary. After Mother left foster care, she missed more than half her visits with Mary. For the next two and one-half years, Mother's contact with Mary was sporadic and chaotic. Therefore, the trial court could have found that

36

Mother failed to visit or maintain significant contact with Mary. *See In re K.G.*, 350 S.W.3d 338, 355 (Tex. App.—Fort Worth 2011, pet. denied).

### c. Inability to Provide Child a Safe Environment

Courts have applied the Section 263.307(b) factors when conducting a "safe environment" analysis in the context of constructive abandonment. *In re G.P.*, 503 S.W.3d 531, 533–34 (Tex. App.—Waco 2016, pet. denied); *In re N.A.V.*, No. 04-19-00646-CV, 2020 WL 1250830, at *7 (Tex. App.—San Antonio Mar. 17, 2020, pet. denied) (mem. op.). Section 263.307(b) provides:

> (b) The following factors should be considered by the court and the department in determining whether the child's parents are willing and able to provide the child with a safe environment:
>
> (1) the child's age and physical and mental vulnerabilities;
>
> (2) the frequency and nature of out-of-home placements;
>
> (3) the magnitude, frequency, and circumstances of the harm to the child;
>
> (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department;
>
> (5) whether the child is fearful of living in or returning to the child's home;
>
> (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;
>
> (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

    (A) minimally adequate health and nutritional care;

    (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

    (C) guidance and supervision consistent with the child's safety;

    (D) a safe physical home environment;

    (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

    (F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

Tex. Fam. Code Ann. § 263.307(b).

After separate placements and then being placed together in a home for sex-trafficked children, Mother and Mary were placed together in a foster home, but Mother would run off without telling anyone and without arranging for anyone to

38

take care of Mary. Eventually Mother left both the foster home and Mary, and for about the next two years, Mother lived what appears to have been a nomadic existence.

Mother asserted that she had finally rented an apartment six months before trial and that she shared it with her boyfriend. She maintained that she had also nearly completed a ten-week drug course. Mother contends that her life was now stable, that she had made progress, and that she could now provide Mary a safe environment.

A factfinder is not compelled to believe uncontradicted testimony that is suspicious or that comes from a biased or an interested source. *Hamilton v. Hamilton*, No. 02-19-00211-CV, 2020 WL 6498528, at *4 (Tex. App.—Fort Worth Nov. 5, 2020, no pet.) (mem. op.) (citing *Medrano v. Gleinser*, 769 S.W.2d 687, 689 (Tex. App.—Corpus Christi 1989, no writ)). The factfinder may believe or disbelieve even uncontradicted, unimpeached testimony from disinterested witnesses. *City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005); *Hamilton*, 2020 WL 6498528, at *4; *Neurodiagnostic Consultants, LLC v. Nallia*, No. 03-18-00609-CV, 2019 WL 4231232, at *11 (Tex. App.—Austin Sept. 6, 2019, no pet.) (mem. op.). The factfinder's credibility decisions must, of course, be reasonable. *City of Keller*, 168 S.W.3d at 816, 820; *Hamilton*, 2020 WL 6498528, at *4.

Mother said that she had a job, but she did not provide any proof of employment. Mother maintained that she had an apartment, but as the Department noted during final argument, Mother produced no lease. Mother asserted that she

lived with a boyfriend who helped her with half the expenses, but she did not say that her boyfriend had a job. She described him as "trying to get himself together." Miller echoed this description of Mother's boyfriend; Miller stated that about all the information that Mother had shared about him was that "he was trying to . . . get on his feet and be stable as well."

When asked a relatively straightforward question about how old her boyfriend was, Mother responded with wildly inconsistent answers. Mother initially said that her boyfriend was born in 1996, then asserted that her boyfriend was forty years old, which would have placed his date of birth in 1980, and finally settled on his birth date being in 1969.

Mother thought that one of her earlier caseworkers had run a background check on her boyfriend, but the caseworker that she named was not among those caseworkers who had testified. Among the caseworkers who had testified, Miller said that she was aware of Mother's boyfriend but asserted that Mother had not provided much information about him. Consequently, other than Mother's recollection, the record did not support her implicit assertion that the Department had run a background check on her boyfriend and that he had passed it. When asked if Mother would be surprised to learn that her boyfriend had a reason-to-believe finding in his CPS history, she answered, "No -- Yes."

Although Mother was relying on her boyfriend for support and stability, and although that reliance would necessarily raise questions about what risks, if any, he

might pose to Mary, he did not testify. A sizeable piece of Mother's stability and safety puzzle was missing.

Pointing to Glover's testimony that the apartment itself provided a clean and safe environment likewise does not help Mother. Glover denied that Mother had shown the ability to provide Mary with a safe and stable environment. While Mother noted that she had recently moved into an apartment, the trial court could have reasonably questioned Mother's ability to keep it. Mother pointed to her boyfriend as additional support, but the trial court could have questioned whether her boyfriend represented a positive change.

Mother also touts her recent progress. A reasonable factfinder could have credited Mother's recent progress as steps in the right direction, but a reasonable factfinder could also have concluded that these steps were nevertheless insufficient to negate years of unsafe conduct. "Evidence of a recent improvement does not absolve a parent of a history of irresponsible choices." *In re A.M.*, 385 S.W.3d 74, 83 (Tex. App.—Waco 2012, pet. denied).

Mother's arguments assume that she provided enough evidence to compel the trial court to find that she now had stability and could provide Mary with a safe environment. Mother presented evidence, but her evidence was far from compelling. Weighing a witness's credibility is the factfinder's province, not ours. *J.P.B.*, 180 S.W.3d at 573. We defer to the factfinder's credibility determinations provided they are not unreasonable. *Id.* On this record, questioning Mother's credibility was

41

not unreasonable. Thus, the trial court had the discretion to disbelieve her testimony. *See Hamilton*, 2020 WL 6498528, at *4; *Medrano*, 769 S.W.2d at 689. As with the other elements, the record supports the trial court's finding that Mother was not able to provide Mary a safe environment. *See K.G.*, 350 S.W.3d at 354–55; *M.R.J.M.*, 280 S.W.3d at 505–06.

### 3. Conclusion

We hold that the evidence sufficed both legally and factually to support the trial court's (N) finding. *See J.F.C.*, 96 S.W.3d at 265–66 (stating that to be legally sufficient, the evidence must be such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations); *C.H.*, 89 S.W.3d at 25 (stating that to be factually sufficient, on the entire record, a factfinder must be able to reasonably form a firm conviction or belief that the parent violated an alleged ground). We overrule Mother's first issue.

## E. Best Interest

In Mother's second issue, she challenges the legal and factual sufficiency of the evidence supporting the trial court's best-interest finding. As set out below, we hold that the evidence is legally and factually sufficient and overrule Mother's second issue.

### 1. The Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250

(Tex. 2013). Evidence that is probative of grounds under Section 161.001(b)(1) may also be probative of best interest under Section 161.001(b)(2). *Id.* at 249; *C.H.,* 89 S.W.3d at 28. Nonexclusive factors that the factfinder in a termination case may also use in determining the child's best interest include:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.,* 402 S.W.3d at 249; *E.N.C.,* 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.,* 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re C.G.,* No. 02-20-00087-CV, 2020 WL 4518590, at *7 (Tex. App.—Fort

43

Worth Aug. 6, 2020, pet. denied) (mem. op.); *In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *4 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.).

## 2. Discussion

### a. The Child's Desires

At the time of trial, Mary was only five years old. As such, she did not possess sufficient maturity to express an opinion regarding a parental preference, and she did not testify at trial. *See In re M.H.*, 319 S.W.3d 137, 150 (Tex. App.—Waco 2010, no pet.); *see also* Tex. Fam. Code. Ann. §§ 153.134(a)(6) (providing that a child must be at least twelve years old before the child's preference, if any, regarding the person to have the exclusive right to designate the child's primary residence becomes a factor); 156.101(a)(2) (same). This factor is thus neutral.

### b. The Child's Emotional and Physical Needs

Mother did not show that she could meet Mary's emotional or physical needs. Foster Mother recounted how Mother's failure to visit Mary consistently caused Mary emotional turmoil. A child needs a home, and although Mother's case had been going on for five years, Mother purportedly procured an apartment of her own only months before trial, and Mary's proposed bedroom within that apartment was unfurnished. In contrast, the foster and proposed adoptive home was meeting both Mary's emotional and physical needs. Glover, Mary's current caseworker, said, "[Mary is] doing very good. She's full of joy. . . . [S]he's just a happy kid." This factor supports the trial court's best-interest finding.

44

### c. The Emotional and Physical Danger to the Child

Mother had endangered Mary both emotionally and physically. Mother's inconsistent visits caused an emotional toll on Mary, and when Mother and Mary were housed together in a foster home, Mother would sneak out of the house without alerting anyone that she had left Mary unattended. By comparison, Mary had emotionally bonded to the foster and proposed adoptive family, and Foster Mother intervened to promote Mary's safety when she thought that Mother was harming Mary by missing visits. This factor favors the trial court's best-interest finding.

### d. The Parental Abilities of the Individuals Seeking Custody

Mother had not shown an ability to parent Mary. Just the opposite, Mother had shown an inability to parent. Foster Mother, however, had parented her other children and was parenting Mary. This factor supports the trial court's best-interest finding.

### e. The Programs Available to Assist These Individuals to Promote the Child's Best Interest

Jensen, the caseworker and supervisor who had worked with Mother for about five years, stated that Mother's participation in services that were designed to help her parent Mary was inconsistent and that Mother had failed to show any progress. Mother was in classes to address drug abuse at the time of trial, and while in those classes, she nonetheless used drugs. After four attempts at getting her GED, Mother still had not passed it. Based on this track record, the trial court could thus conclude

that even if programs were made available to Mother, the programs would not benefit her. This factor weighs in favor of the trial court's best-interest finding.

### f. The Plans for the Child by These Individuals or by the Agency Seeking Custody

Mother ostensibly planned to move Mary into the apartment that she shared with her fifty-one-year-old boyfriend. While Mary's bedroom had no furniture, clothing, or toys, Mother would presumably furnish those. Casting a cloud over these plans, however, was Mother's failure to provide any proof of employment. If adopted by the foster family, Mary would live in a "nice home" in a "nice neighborhood," would share a bedroom with a sister, and would have her own toys. Given Mother's history of moving and given the questions surrounding her employment, this factor buttresses the trial court's best-interest finding.

### g. The Stability of the Home or Proposed Placement

Mary had spent virtually her entire life in foster placements. Mary was now in a placement that was adoption motivated. By this point, Mother represented a destabilizing influence on Mary. Mother's visits were unpredictable, and Mother saw herself as a vagabond. Unstable herself, Mother had no stability to offer Mary. Mother became an impediment to Mary's stability. "[C]hildren need permanency and stability." *In re G.V., III*, 543 S.W.3d 342, 350 (Tex. App.—Fort Worth 2017, pet. denied). A child's need for permanence through the establishment of a stable, permanent home is a paramount consideration in the best-interest determination. *In*

*re E.R.W.*, 528 S.W.3d 251, 267 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Once again, this factor supports the trial court's finding that termination was in Mary's best interest.

### h. The Parent's Acts or Omissions that May Indicate that the Existing Parent-Child Relationship is Not a Proper One

Mother exhibited behaviors inconsistent with an appropriate parent-child relationship. Rather than stay in a foster home with Mary to learn the skills needed to live and to parent independently, Mother sneaked out of the home without arranging for anyone to care for Mary. Further, Mother left the foster home and eliminated any possibility of parenting Mary on a day-to-day basis. This factor favors the trial court's best-interest finding.

### i. The Parent's Excuse, if Any, for the Acts or Omissions

Faulting Mother seems unfair. She was young, and her history was turbulent and traumatic. Yet our focus is on what is in Mary's best interest, and in this instance, Mother's youth and troubled past, which years of services failed to compensate for, are factors weighing in favor of the trial court's best-interest finding.

### 3. Conclusion

Viewing the evidence in the light most favorable to the trial court's finding, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination was in Mary's best interest and thus that the evidence was legally sufficient. *See J.F.C.*, 96 S.W.3d at 266. And when viewing the evidence equally, in

47

light of the entire record and while giving due deference to the trial court's findings, we hold that a reasonable factfinder could have reasonably formed a firm belief or conviction that the termination was in Mary's best interest and, therefore, that the evidence is factually sufficient as well. *See id.*; *C.H.*, 89 S.W.3d at 26. We overrule Mother's second issue.

## F. Conservatorship after Termination

In issue three, Mother argues that the trial court erred by finding that appointing her as permanent managing conservator of Mary was not in Mary's best interest because the appointment would significantly impair Mary's physical health or emotional development. S*ee* Tex. Fam. Code Ann. § 153.131(a) ("[U]nless the court finds that appointment of the parent . . . would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator . . . of the child."). Ignoring Mother's reliance on Section 153.131, the Department responds that the record supports the trial court's determination that appointing it as Mary's managing conservator was in Mary's best interest. *See In re T.M.*, No. 02-19-00329-CV, 2020 WL 523272, at *5 (Tex. App.—Fort Worth Feb. 3, 2020, no pet.) (mem. op.). We agree with the Department.

The trial court made a Section 153.131 finding. We first address where the Section 153.131 finding fits in the context of Mother's case.

48

Section 153.131 applies when parental rights have not been terminated. *In re P.M.B.*, No. 01-17-00621-CV, 2017 WL 6459554, at *15 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. denied) (mem. op.); *In re E.R.*, No. 01-17-00503-CV, 2017 WL 5892402, at *13 (Tex. App.—Houston [1st Dist.] Nov. 30, 2017, pet. denied) (mem. op.); *In re M.M.M.*, No. 01-16-00998-CV, 2017 WL 2645435, at *17 (Tex. App.—Houston [1st Dist.] June 16, 2017, no pet.) (mem. op.); *In re S.N., Jr.*, Nos. 05-16-01010-CV, 05-16-01033-CV, 05-16-01034-CV, 05-16-01035-CV, 2017 WL 2334241, at *5 (Tex. App.—Dallas May 30, 2017, no pet.) (mem. op. nunc pro tunc).[12] When the termination is reversed, the presence or absence of a Section 153.131 finding plays a role. *See In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008) (per curiam); *In re J.A.J.*, 243 S.W.3d 611, 612–13, 617 (Tex. 2007).

Here, though, Mother's termination remains intact. When a trial court terminates a birth parent's parental rights, the birth parent is no longer the "parent" under the Texas Family Code. Tex. Fam. Code Ann. § 101.024(a); *In re N.B.*, No. 05-15-00671-CV, 2015 WL 6437681, at *5 (Tex. App.—Dallas Oct. 23, 2015, pet. denied) (mem. op.). More specifically, Mother is no longer a "parent" under Section 153.131. *See* Tex. Fam. Code Ann. §§ 101.024(a), 153.131.

When a trial court terminates a birth parent's rights, Section 161.207 controls the appointment of a managing conservator. *P.M.B.*, 2017 WL 6459554, at *15; *E.R.*,

---

[12]*See In re S.N., Jr.*, Nos. 05-16-01010-CV, 05-16-01033-CV, 05-01034-CV, 05-16-01035-CV, 2017 WL 3435599, at *5 (Tex. App.—Dallas Jan. 18, 2017, pet. denied) (mem. op.).

2017 WL 5892402, at *13; *M.M.M.*, 2017 WL 2645435, at *17; *S.N., Jr.*, 2017 WL 2334241, at *5. After termination, the trial court appoints "a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a).

We review a trial court's appointment of a non-parent as managing conservator for an abuse of discretion. *T.M.*, 2020 WL 523272, at *5. Thus, we may reverse the trial court's appointment of a non-parent as managing conservator only if we determine that the trial court acted arbitrarily or unreasonably. *Id.*

When determining issues of conservatorship, the primary consideration is the best interest of the child. Tex. Fam. Code Ann. § 153.002; *T.M.*, 2020 WL 523272, at *5. And when determining a child's best interest in the context of conservatorship decisions, we may use the *Holley* factors, listed above in the context of best interest and termination. *T.M.*, 2020 WL 523272, at *5. Unlike the burden of proof necessary to support the termination of parental rights (clear and convincing), the burden of proof necessary to appoint a non-parent as managing conservator is a mere preponderance of the evidence. *See id.*

Because Mother's parental rights were terminated, Section 161.207—not Section 151.131—applies. *See P.M.B.*, 2017 WL 6459554, at *15. Under Section 161.207, Mother has failed to show that the trial court abused its discretion by appointing the Department as Mary's managing conservator. *See M.M.M.*, 2017 WL 2645435, at *17. We have previously held that the Department met its clear-and-

50

convincing burden to show best interest in the context of termination, so it follows that the Department met the lower preponderance-of-the-evidence burden to show best interest in the context of conservatorship. Having terminated Mother's parental rights, the trial court acted neither arbitrarily nor unreasonably by appointing the Department as Mary's managing conservator. *See T.M.*, 2020 WL 523272, at \*5. We overrule Mother's third issue.

## IV. CONCLUSION

Having overruled Mother's three issues, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered: June 28, 2021